## PARKLAWN, INC. *v.* GIANT FOOD, INC.

[No. 424, September Term, 1970.]

*Decided May 13, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*William L. Kaplan*, with whom were *Feissner, Kaplan & Smith, Karl G. Feissner, Thomas P. Smith, Fred R. Joseph* and *Andrew E. Greenwald* on the brief, for Parklawn, Inc., appellant-cross-appellee.

*William F. Abell, Jr.*, with whom were *Robert C. Heeney* and *Heeney, McAuliffe & McAuliffe* on the brief, for Giant Food, Inc., appellee-cross-appellant.

HAMMOND, C. J., delivered the opinion of the Court.

This is the third appeal—and we hope the last—in proceedings brought below by Parklawn, Inc., a cemetery corporation (appellant and cross-appellee), against upper landowners to obtain relief and redress from the periodic flooding of a part of its cemetery lands by the stream which runs through the cemetery. In 1964 Parklawn filed suit against Washington-Rockville Industrial Park, Inc. and forty others, and in 1965 filed another suit against Giant Food, Inc., appellee and cross-appellant, and another. Both suits claimed damages from the defendants for negligently causing excessive water, silt, debris and dirt to be deposited on Parklawn's lands, and for ancillary injunctive relief. Various defendants settled the claims against them and were dismissed by Parklawn. The court entered summary judgments in favor of others. See *Parklawn v. Nee*, 243 Md. 249. The two suits thereafter were consolidated. In 1967 Giant filed third party claims against the defendants who had been dismissed by Parklawn, and two others. The trial court sustained a demurrer to the amended claims and we reversed in *Giant Food, Inc. v. Washington-Rockville Industrial Park, Inc.*, 254 Md. 100.

In July 1970 the case now before us went to trial against Giant and several other defendants. Judge Joseph Mathias directed verdicts for the others and sent the case against Giant to the jury, which returned a verdict in Parklawn's favor for $22,000. Judge Mathias refused to issue an injunction against Giant requiring it to act to prevent future invasions of Parklawn's lands, saying:

"The Court is of the opinion that with regard to the defendant Giant Food's contribution to the *continuing* flow of surface water on the plaintiff's property, there was insufficient evidence to justify the harsh remedy of a mandatory injunction."

Giant appealed from the money judgment and Parklawn from the refusal to issue an injunction.

No elaborate recital of the facts is necessary as a basis for decision. One Moss, a real estate developer, acquired a tract of land of some 409 acres in 1952. Two of Moss's alter-ego corporations took title; one, North Washington Cemetery, Inc., owned 164 acres on which it operated a cemetery. The cemetery was sold in 1958 to Parklawn. The other corporation owned the rest of the 409 acres. Moss was asked whether he remembered the stream that ran through the tract he owned and whether there were times after a heavy rainfall when it overflowed its banks, and he replied that there were "many occasions" before he sold the land when this occurred. Some 120 acres were developed for miscellaneous purposes between 1952 and 1958, and industrial and commercial development began in 1959, 125 acres being devoted to the Washington-Rockville Industrial Park. Giant acquired some 40 acres on which it built a shopping center in 1961 and 1962 which began operations in 1963.

When the land was changed from its natural state into roads, streets, paved surfaces for parking lots and other purposes, and bare ground and piles of earth, the water that had flowed from the land into the stream that

runs through the cemetery carried silt and dirt down-
stream, and when the rainfall was unusually heavy over-
flowed its banks and deposited silt onto certain sections
of the cemetery land. A pond in the cemetery on which
swans floated to add an aura of peace and tranquility to
the scene .for the benefit of those left behind by a be-
loved deceased and to entice prospective lot purchasers
to sign on the dotted line became silted up and discolored,
and the swans had to be taken to other waters. Twenty-
three thousand square feet of low lying cemetery land
had to be abandoned and purchasers of lots in those parts
—cheaper lots—had to be given more expensive lots in
higher sections.

The expert for Parklawn said Giant contributed about
25% of the water, silt and dirt that invaded Parklawn.
Giant's expert said about 31%. Parklawn's expert
agreed with the expert from Giant that the storm drain-
age system that was designed, engineered and used by
Giant was in accord with accepted engineering practices
in effect when the construction took place, that it used
the proper "run-off co-efficient" and was approved by the
various Montgomery County regulatory agencies. He
agreed with Giant's expert that soil conservation prac-
tices in 1960-61-62 were not those that now would be
accepted if not required practice to prevent soil erosion
and silting. He added that silting basins and diversion
berms were known at the time Giant constructed its
shopping center in the early 1960s but that they were
not used and not required by inspectors, and that he, an
expert in the field, had not used them in designing drain-
age systems comparable to Giant's. He testified, however,
that when he visited the site in 1964 after the stores and
the surrounding area were finished and in operation,
"there was an area in back of the parking lot that was
just a bare field, and it had drainage gullies in it; ob-
vious soil erosion; gullies five or six foot deep." Giant's
expert said soil eroded from the area in back of the stores
could be drawn into the stream that runs through the

cemetery, that it was accepted practice in 1961-63 to sod or pave bare ground after construction was finished and although he had designed and been in charge of the drainage disposal system for Giant, he did not know of the bare area being sodded or seeded from 1963 up to within four or five weeks of trial, and that to the best of his knowledge "this land behind the Giant property laid bare and open other than whatever weeds were growing there." Judge Mathias in denying Giant's motion for a directed verdict at the conclusion of the plaintiff's case commented that:

> "[S]everal acres of undeveloped land out in back of the [Giant] store which it was testified was without cover, had been denuded and that silt from there undoubtedly went down onto the plaintiff's property and, of course, we had a view of the property and the jurors were able to see this undeveloped land in back of Giant and to see for themselves that it possibly was the cause of considerable silt being carried down onto the property of the plaintiff * * *."

We think there was sufficient evidence that Giant was negligent in not sodding or seeding or otherwise preventing the rear area from eroding onto and damaging Parklawn's property to go to the jury and support the verdict. *Kennedy-Chamberlin Development Company v. Snure,* 212 Md. 369; *Battisto v. Perkins,* 210 Md. 542; *Baer v. Board of County Commissioners of Washington County,* 255 Md. 163.

Giant argues that the trial court erred twice in submitting the case to the jury: first because there was no evidence of its negligence, a contention no longer available to it, and second because it erroneously submitted the issue of Giant's maintaining a nuisance to the jury. Parklawn's declaration alleged that Giant was negligent "in failing to * * * take reasonable precautions against the foreseeable consequences of its acts and has main-

tained a nuisance which is continuing to cause plaintiff damage * * *." Giant says this impermissibly alleged two causes of action in one count. Maryland Rule 340 c. Judge Mathias charged the jury that the test of negligence is what an ordinarily reasonable and prudent person would have done under the circumstances, and that they must determine whether Giant so acted, then defined a private nuisance as "annoyance" that might arise from odors, smoke, excessive water, or silt, and added: "[Y]ou must ask yourself whether or not reasonable precautions were taken by Giant to prevent the creation of such a private nuisance, if you should find a private nuisance was created."

We said in the second appeal in these proceedings at page 108 of 254 Md.:

> "When one carefully analyzes the pertinent pleadings in this case, it is apparent that Parklawn, the original plaintiff, has alleged negligence on the part of the defendants * * *. It likewise is apparent that Giant Food * * * [has] alleged that the third party defendants are or will be liable to them because of this joint liability, liability in each instance based on allegations of negligence. See [various cited cases] relative to the distinction between nuisance and negligence."

We reaffirm what we said in the second appeal. The allegations of the declaration and the charge to the jury both required a finding of negligence on Giant's part as a basis of any liability to Parklawn. The term nuisance was not used in the declaration or the charge in the sense referred to in *Sherwood Brothers, Inc. v. Eckard,* 204 Md. 485, 493, as follows:

> "A nuisance exists because of a violation of an absolute duty so that it does not rest on the degree of care used but rather on the degree of

danger existing with the best of care. Negligence, on the other hand, is the violation of a relative duty for failure to use a degree of care required under particular circumstances."

The word nuisance as used in the declaration and in the charge meant, in our view, the results attributable to the failure to use due care under the circumstances. Compare *Mattingly v. Hopkins*, 254 Md. 88, 96-97. We think Giant realized and acknowledged this. It did not demur to or otherwise challenge the declaration. It did not object or except to the charge on this point. In *Kirchner v. Allied Contractors*, 213 Md. 31, 36, we disposed of a contention similar to that of Giant by saying:

"We may dismiss the appellee's contention as to variance. If the allegations as to negligence were properly included in the amended third count, there was no variance. Again, there was no reference to the pleadings in its motion for a directed verdict or in the prayer it submitted. We may also dismiss its contention as to duplicity in the third amended count, since there was no demurrer to it."

Giant's final contention is that the trial judge improperly submitted the case to the jury on the sole issue of Giant's liability to Parklawn without requiring a determination as to the liability of the third party defendants. The short answer is that the parties stipulated that this was to be the mode of procedure, agreeing on the record that the jury was to determine whether Giant was responsible in damages to Parklawn, leaving out any question of Giant's claims against others and also agreeing that the jury would determine the amount in dollars of Giant's proportion of the total damages.

We come then to the question of the correctness of Judge Mathias' refusal to issue an injunction. In *Turner v. Washington Suburban Sanitary Commission*, 221 Md.

494, 506, Judge Henderson, later Chief Judge, said for the Court:

"We think the trial judge erred in denying injunctive relief. * * * [S]o long as the channeling and discharge of water is suffered to continue without abatement, there is the strong probability of future damage, and the prospect of future actions at law, which would make equitable relief singularly appropriate. For a discussion of the problem, see *Spaulding v. Cameron*, 239 P. 2d 625 (Cal.), cited in the *Battisto* case, *supra*, and *Restatement, Torts*, § 930. We are not persuaded by the trial court's statement that there is no way in which the exact quantity of increased flow could be determined. It is enough that there was a material increase. The wrongdoer may not apportion his own negligence. *Laird, Rock & Small, Inc. v. Campbell*, 200 Md. 627, 632. * * * On remand, the trial court may properly consider expert testimony as to whether some modification of the storm drainage system might disperse the flow and prevent the wrongful concentration and discharge of surface waters, and whether disposal could reasonably be made at some other point. We do not suggest the exact form of relief, but we think it was not reasonable for the trial court to refuse any injunctive relief against the recurrence of an injury which admittedly caused substantial damages in the past, without a showing of reasonable efforts to correct it."

In the case before us Giant's neglect of the area in back of the shopping center that led to its depositing silt on Parklawn's lands, and so to the jury's award of damages still, apparently, continues. We think the trial court should require by equitable order that Giant take

156

whatever reasonable steps are necessary to prevent further erosion of that back area.

> *Judgment for monetary damages against Giant affirmed; order refusing injunctive relief to Parklawn against Giant reversed, and case remanded for further proceedings as indicated by the opinion herein; costs to be paid by Giant.*