MARK DOWNS, INCORPORATED ET AL. *v.*
McCORMICK PROPERTIES, INCOR-
PORATED ET AL.

[No. 874, September Term, 1981.]

*Decided March 5, 1982.*

The cause was argued before LOWE and WILNER, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals (retired), specially assigned.

*H. Patrick Stringer, Jr.,* with whom was *Edward L. Blanton, Jr.,* on the brief, for appellants.

*C. Gordon Haines,* with whom was *Christopher Russo* on the brief, for appellee Noxell Corporation. *Robert J. Aumiller* for appellees MacKenzie & Associates, Clark F. MacKenzie and Roland R. MacKenzie. *Laurie R. Bortz,* with whom were *William B. Somerville* and *Arnold Jablon* on the brief, for appellee Board of Education. *Ernest C. Trimble* for appellee McCormick Properties, Incorporated. *Stanley J. Schapiro, Assistant County Solicitor for Baltimore County,* with whom was *Leonard S. Jacobson, County Solicitor for Baltimore County,* on the brief, for appellee Baltimore County, Maryland.

WILNER J., delivered the opinion of the Court.

Appellants (hereafter referred to as complainants) own or lease property in the Cockeysville area of Baltimore County near the intersection of York Road and Beaver Run Lane. In September, 1979, their property was flooded and substantially damaged as an aftermath of tropical storm "David"; and, through this lawsuit, they seek to place at least part of the responsibility for that damage on the activities of appellees.

The Circuit Court for Baltimore County, by sustaining appellees' demurrers, and in one case a motion raising preliminary objection, decided that the storm was an "Act of God" and that none of the earthly defendants could be held liable for the destruction wrought by it. This appeal followed.

## I. *Procedural History*

The original bill of complaint named as defendants McCormick Properties, Inc. (McCormick), MacKenzie & Associates (MacKenzie, Inc.), Noxell Corporation (Noxell), Friends Lifetime Care Center (Friends), the county Board of Education (Board of Education), Baltimore County, and two county officials (Donald P. Hutchinson, County Executive, and John D. Seyffert, Director of Planning and Zoning). It alleged, in relevant part, that:

(1) Complainants' properties, acquired by them in 1973 or later, have an elevation of between 240 and 243 feet and are in a ten-year flood plain emanating from the confluence of Beaver Dam Run and Western Run, "just north and east of the property";

(2) Their properties had been inundated in 1933, 1956, and 1972, when flood waters crested at 251.4 feet, 252.9 feet, and 263.3 feet, respectively;

(3) The 1972 flood, brought on by tropical storm "Agnes," had been deemed an "Act of God";

(4) Despite these conditions, the county failed to implement certain flood control measures that had been recommended to it by consultants, and the county officials failed to stop development within the Beaver Dam and Western Run watersheds or to refrain from "issuing permits for construction of property" in those watersheds; and

(5) The other defendants, who own property upstream from complainants, proceeded to develop their properties in various ways which reduced the absorption capacity of the land and increased the storm water run-off.

The net effect of all this, said complainants, was to increase the amount of storm water run-off across complainants' property during tropical storm "David," thereby increasing the depth of the flood water across complainants' property. They asked the court to enjoin the county officials from issuing any further construction permits for property within the two watersheds, to enjoin the defendant property owners "from any further construction or improvement of any type whatsoever" within the watersheds, and to require all defendants to pay, as damages, the $668,177 in losses suffered by complainants less the amount of any flood insurance benefits recovered by them.

The two county officials demurred on the ground of governmental immunity. The county responded with a motion raising preliminary objection on that ground and on the further ground that complainants had failed to provide the notice of claim required under Courts article, § 5-306. The court ultimately accepted that response and (1) sustained the officials' demurrer without leave to amend, and (2) granted the county's motion raising preliminary objection.

The other defendants also demurred for varying reasons. Their demurrers were sustained as well, but with leave to amend. Eventually, an amended, and then a second amended, bill of complaint were filed. Demurrers to the latter pleading were filed and sustained, without leave to amend.

The appeal now before us is from the orders (1) granting the county's motion raising preliminary objection, filed in

response to the *original* bill of complaint, and (2) sustaining, without leave to amend, the demurrers of the other defendants filed in response to the *second amended* complaint.[1]

The second amended bill of complaint was directed against the upstream property owners previously named — McCormick, MacKenzie, Inc., Noxell, Friends, and the Board of Education — plus two new ones, Clark and Roland MacKenzie. It sought essentially the same relief, namely, an injunction against any further development by the defendant property owners and damages for losses incurred as the result of tropical storm "David." With respect to the damage claim, it purported to set out three causes of action: trespass, negligence, and nuisance.

Complainants again averred that their property is located in a ten-year flood plain created by the confluence of Beaver Dam Run and Western Run to the north and east, but they made no mention in this pleading of the prior flooding in 1933, 1956, and 1972. The elevation of their property was claimed in this new pleading to be eight to nine feet higher than had been averred in the original complaint.

With respect to McCormick, complainants alleged that: (1) it owned a large tract of industrial land east of Interstate 83 and south of Shawan Road, which is at a higher elevation than complainants' property and which drains into the Beaver Dam and Western Run watersheds; (2) since 1971, McCormick filled and graded the land and constructed improvements on it, "thereby reducing the natural absorption capacity of the property, causing the discharge of surface water in a different manner than the usual and ordinary natural course of drainage, and artificially and materially increasing the velocity and amount of storm water run-off"; (3) the increased run-off into Beaver Dam Run and Western Run filled those streams beyond their natural capacity, causing them to overflow onto complainants' land and thus add to the depth of the flood waters which

---

1. Complainants did not appeal the order sustaining the demurrer of Friends, and they dismissed their appeal from the order sustaining the demurrer of the two county officials.

inundated appellants' land during tropical storm "David." The crux of the complaint was not the actual flooding of their property, but rather that, by reason of McCormick's development, the storm water backed up onto complainants' property "at a greater depth than otherwise would have occurred." They claimed damage to their property "[b]y reason of the increased height of flood waters attributable in part" to McCormick's development activities.

Essentially the same allegations were made as to the other defendants as well — that their property was within or adjacent to a flood plain and that they developed their property so as to reduce its natural absorption capacity which caused, sequentially, an increased run-off and discharge into one or both streams, a filling of the streams beyond their natural capacity, and an exacerbation of the flooding of complainants' property during tropical storm "David" by adding to the depth of the flood waters.

There were some minor variations in the allegations regarding the location of the defendants' respective properties. Unlike the allegations concerning McCormick, the exact location of the other properties was not specified; they were, however, claimed to be "upstream and in close proximity to the Complainants' property," at a higher elevation, and within the Beaver Dam or Western Run watershed. None of the defendants' properties was alleged to be adjacent to that of complainants; the closest complainants came to that was a statement that the Board of Education property was "upstream and just west and north of Complainants' property."

All three claims — trespass, negligence, and nuisance — were built upon these basic factual allegations, which were incorporated into each claim.

The trespass action arose from the averment that, by reason of their development activities, the defendants "increased the run-off of surface water, silt, mud and debris from [their] property onto the Complainants' property during the tropical storm 'David'. . . ." The negligence action proceeded from the assertions that, in undertaking their

respective development activities, the defendants had a duty to take reasonable precautions to prevent harm to appellants' property "caused by the increase in surface water run-off which foreseeably accompanied the development of the land," and that they violated that duty by failing to take "adequate and reasonable precautions." In particular, appellants claimed that the defendants "failed to provide adequate storm water management to control the increased volume and velocity of surface water run-off caused by the development of [their] property."

Finally, in the nuisance action appellants averred that the increased run-off attributable to the defendants' development activities "caused and continues to cause flooding, deep mud and stagnation on the Complainants' property, which constitutes a health menace and otherwise damages the Complainants' property."

The demurrers filed in response to this second amended complaint asserted in general that it failed to establish the breach of any duty owed to complainants that was the proximate cause of their injury. They claimed (1) with respect to the trespass action, a failure to allege that the defendants or "a person, object or element in [their] control . . . made an unauthorized entry onto the Complainants' land"; (2) as to the negligence action, that the facts alleged would not establish that the defendants' activities were "unreasonable or in contravention of any duty owed to Complainants" or that such activities were the proximate cause of Complainants' injuries; and (3) with respect to the alleged nuisance, that no facts were set forth which would demonstrate that the defendants' activities "were such as to result in unreasonable storm water run-off" and that the facts alleged establish that defendants' activities "could not have been the proximate cause of the Complainants' injuries."

In sustaining the demurrers, the court noted the 1972 flooding that resulted from "Agnes," and by referring to a map supplied by one of the defendants, concluded that the defendants' properties "are a substantial distance from [complainants'] property." It also found as a matter of law, if not

fact, that tropical storm "David" (and the damage wrought by it) was an "Act of God," and thus, that "the essential damages were not proximately caused by action of the defendants but were the direct and proximate result of an Act of God." Referring to *Laird, Rock & Small, Inc. v. Harry T. Campbell & Sons,* 200 Md. 627 (1952), the court noted that, although the extra run-off from defendants' development may have added somewhat to the water in Western Run, given the "devastating and overwhelming hurricane, such as David," that would fall "within the de minimis doctrine."

Although recognizing that the trespass and negligence actions are traditionally law rather than equity actions, the court decided the issue not on that basis, but rather on the basis that the allegations themselves were insufficient to state causes of action. In that regard, it stated that

> "there being no allegation that the respondent's [*sic*] properties were used unreasonably, there is nothing to indicate in this case that the injury resulting from hurricane David would have been significantly added to by any increase of run off attributable to merely developing a piece of ground. In this case there was no direct channelization alleged."

The premise underlying the court's ultimate ruling was that "[t]he Complainants are trying to extend the liability of an upper land owner to a degree that is neither reasonable or equitable."

## II. *Issues Raised by Complainants*

In this appeal, complainants present the following issues:

> "I. Whether the Court erred by sustaining the upper landowners' demurrers to the Second Amended Bill of Complaint without leave to amend?
>
> A. Whether the law of surface water gives a lower landowner a cause of action where the

development of upper land caused an increase in flow of surface water into a stream, causing the stream to overflow its banks and flood the lower land?

B. Whether an upper landowner may drain so much surface water into a stream that the natural capacity of the stream is exceeded to the injury of a lower landowner?

C. Whether, for an invasion of an interest in land by surface water, recovery can be sought in equity, or in an action at law for negligence, nuisance or trespass?

D. Whether the defense of an Act of God is available where an intervening human agency contributes to cause the damage complained of, and where the injury could have been avoided by precautions?

II. Whether private property has been taken, within the meaning of the Maryland Constitution, by developing land for the Board of Education of Baltimore County that caused an increase in the flooding of lower land?"

## III. *Analysis*

### A. *Taking by Board of Education*

We shall address the last issue raised by complainants first. The simple answer to it is that it was not raised in the second amended bill of complaint, and therefore was not considered by the lower court. The only complaints made against the Board of Education were that its development activities constituted a trespass, negligence and a nuisance; there was no assertion that its actions amounted to a constitutional "taking" of appellant's property. We shall therefore not consider this belated charge on appeal. Maryland Rule 1085.[2]

---

2. At oral argument, counsel informed us that, in Issue II, quoted above, appellants intended to refer to Baltimore County rather than to the county

### B. *Dismissal of Baltimore County*

As noted, Baltimore County was dismissed as a defendant, essentially on the ground of governmental immunity, upon its motion raising preliminary objection. Although in the section of their brief entitled "Statement of the Case," appellants advise us that, along with the court's rulings on the various demurrers, they are appealing the order dismissing the county, they do not include in the "Questions Presented" or in their argument any complaint about or further mention of that aspect of the case. They do not, in short, tell us why they think the court erred in its ruling on the county's motion. *Cf.* footnote 2, *supra.* Their argument is directed entirely at whether a cause of action was stated against the various upstream property owners, and no reason is cited to us for reversing the court's decision as to the county's defense of governmental immunity. Accordingly, we shall not address or disturb that decision. Maryland Rule 1031; *Jacober v. High Hill Realty, Inc.,* 22 Md.App. 115, *cert. den.* 272 Md. 743 (1974); *Federal Land Bank of Baltimore, Inc. v. Esham,* 43 Md.App. 446, 457-58 (1979), and cases cited therein. *See,* moreover, *Irvine v. Montgomery County,* 239 Md. 113 (1965); *Spriggs v. Levitt & Sons, Inc.,* 267 Md. 679 (1973).

### C. *Actions Against Other Property Owners*

The remaining issues raised by complainants must be addressed in the context of their procedural setting; namely, whether the court erred in disposing of the matter on demurrer. In judging that question, we are obliged (1) to consider

---

Board of Education, and that an allegation of taking was made against the county in the original bill of complaint. This is based upon a general allegation in that complaint that, as a result of the actions of all the defendants, "the Complainants have been deprived of the use and quiet enjoyment of [their] property and buildings. . . ." We do not regard that statement as a sufficient allegation of an implicit exercise of the county's power of eminent domain; nor are we impressed by the contention that Issue II was intended to refer to anyone other than the entity to which it plainly refers — the Board of Education, which has its own statutory power of eminent domain. Md. Code, Education Article, § 4-118.

only the allegations contained in the second amended complaint, and not any, evidence or averments extraneous thereto, and (2) to assume the truth of all relevant facts well pleaded in that complaint, as well as all inferences which may reasonably be drawn from those facts. *Zion Evangelical Lutheran Church of the United Church of Christ v. State Highway Administration,* 276 Md. 630 (1976); *Hall v. Barlow Corporation,* 255 Md. 28, 42 (1969), *appeal following remand* 260 Md. 327 (1971); *Schwartz v. Merchants Mortgage Co.,* 272 Md. 305 (1974). Those constraints require that we disregard the consultants' reports and maps included in the record extract and referred to in appellees' brief, as well as those allegations made in the earlier bills of complaint but not repeated in the second amended complaint presently before us.[3]

Complainants' actions of trespass, negligence, and nuisance, though distinct from one another in their constituent elements, all derive in this instance from the correlative rights (and obligations) of neighboring landowners with respect to the natural flow of surface water. The basic law in that regard is fairly clear; the problems lie with its application.

Because it displaces valuable land and has great destructive potential, surface water has often been regarded as a common enemy by property owners. No one wants it, but someone must have it. This has produced a raft of lawsuits over the years, usually — at least in the early years — arising from attempts by the owners of lower lying property to stem or reverse the natural flow of the water by means of embankments or other artificial changes to their land.

In that context — the extent to which a lower property owner may act to reverse or neutralize the natural

---

**3.** Unlike an amendment *to a complaint,* an *amended complaint* replaces the earlier complaint in its entirety. The earlier complaint is regarded as withdrawn or abandoned, and is no longer part of the complainant's averments against his adversary. The sufficiency of his case thereafter depends upon the allegations of the amended complaint, without regard to what preceded it. *See Shapiro v. Sherwood,* 254 Md. 235 (1969); *Conklin v. Schillinger,* 255 Md. 50, 75 (1969); 3 Sachs, *Poe's Pleading and Practice,* § 189 (6th Ed. 1975).

gravitational flow — two schools of thought developed. One, denoted the "common law" rule, holds that "the ordinary right of an owner of land to make any use whatever of his land either by erections thereon or changes in the surface, is regarded as independent of the effect which such erections or changes may have in causing water which naturally flows off on his land to collect or flow on other land." *Whitman v. Forney,* 181 Md. 652, 656-57 (1943), quoting from 3 *Tiffany on Real Property,* § 743 (3d ed. 1939). The other rule, known as the "civil law" rule, holds that "land on which surface water naturally flows from another tenement is regarded as subject to a servitude of receiving such flow, and consequently the owner has no right, by any erection or improvement to prevent the escape thereon of water from the higher land." *Id.* at 656.

Maryland has long (and consistently) followed the "civil law" rule; however, beginning at least in 1943 with *Whitman v. Forney, supra,* and possibly earlier (*see Neubauer v. Overlea Realty Co.,* 142 Md. 87 (1923), and cases cited therein), the Court of Appeals attempted to ameliorate some of the harshness of that rule by adopting a qualification to it. As stated in *Baer v. Board of County Commissioners,* 255 Md. 163, 168 (1969), "[o]nto the civil law rule our decisions have engrafted a 'reasonableness of use' test, where a balance of benefit and harm is struck in hardship cases, to make sure that the owner of the servient estate is not unreasonably denied use of his property." In *Kidwell v. Bay Shore Development Corp.,* 232 Md. 577, 584 (1963), the Court characterized this "test" as follows:

> "The application of this [reasonableness of use] doctrine does not change the adopted [civil law] rule of law, but provides mitigation from harsh results which may be reached by a strict application thereof. It depends upon the facts of each particular case, is peculiarly appropriate for an equity court to follow, and, in cases where undue hardship will ensue to one or the other of property owners by a rigid application of the civil-law rule, it has the

advantage of flexibility, whereby the rights of the respective owners may be equitably determined by an assessment of all the relevant factors relating to the disposition of surface waters."

The basic civil law rule, though apparently fashioned in the context of "self-help" measures undertaken by the lower lying property owner, is equally applicable where judicial relief is sought. This is also true with respect to the "reasonableness of use" qualification to the basic rule; indeed, the qualification is more particularly applicable (and more frequently applied) in the latter context than in the former.

The rule of reasonableness of use is one of fairness, and its application depends upon the circumstances evident in the particular case. That is why the manner of its use in one case does not require the same manner of its use in another. Yet, the scope of the rule — when its application, and what manner of application, are appropriate — may only come from a distillation of the principles announced and applied in other cases.

It is not necessary to recount the complicated fact situations in each of the many cases discussing and applying the qualification in order to discern the applicable standards that both justify and circumscribe its use. The doctrine, or something akin to it, has been applied to prevent the dominant landowner from:

(1) increasing *materially* the quantity or volume of water discharged onto the lower land; [4]

(2) discharging water in an artificial channel or in a different manner than the usual and ordinary natural course of drainage; [5]

(3) putting upon the lower land water that would not have

---

4. *Biberman v. Funkhouser,* 190 Md. 424 (1948); *Hancock v. Stull,* 199 Md. 434 (1952), and 206 Md. 117 (1955); *Battisto v. Perkins,* 210 Md. 542 (1956).

5. *Biberman v. Funkhouser, supra; Turner v. Washington Suburban Sanitary Commission,* 221 Md. 494 (1960), *appeal following remand* 228 Md. 105 (1962); *O.F.C. Corp. v. Turner,* 228 Md. 105 (1962); *Baer v. Board of County Commissioners, supra,* 255 Md. 163.

flowed there if the natural drainage conditions had not been disturbed; [6]

(4) causing dirt, debris, and pollutants to be discharged onto the lower land; [7] or

(5) otherwise creating a health hazard.[8]

Even where these types of situations have existed, the Court has unhesitatingly recognized the right of the dominant owner to the continuance of natural drainage, thus making clear that, in Maryland, the doctrine of "reasonableness of use" is but a qualification to, and not a substitute for, the civil law rule. Primarily, what the Court has done in applying the qualifying doctrine is to fashion, as part of the relief granted, conditions designed to lessen, if not avoid, some special harm to the servient land, or to prevent the dominant owner from continuing to use his property in an unreasonable manner to the detriment of his neighbor. Absent sufficient evidence (or, in the case of a demurrer, sufficient allegations) of an unreasonable use by the dominant owner or of special harm to the servient land from causes other than the natural drainage of water, the doctrine is inapplicable because, in that circumstance, it has no *raison d'etre.*

The trial court, in ruling on the demurrers, correctly stated the law. We think, however, that it erred in applying that law in light of the allegations contained in the second amended complaint.

The court began its analysis by focusing on the locations of the various properties. Stating that there was "no allegation in the bill of complaint as to how far away the respondents' properties are from the complainant's [*sic*] property," it referred to the maps supplied by defendants and concluded, from them, that the properties were "a substan-

---

**6.** *Laird, Rock & Small v. Harry T. Campbell & Sons, supra,* 200 Md. 627 (1952); *Battisto v. Perkins, supra.*

**7.** *Neubauer v. Overlea Realty Co., supra,* 142 Md. 87; *Bishop v. Richard,* 193 Md. 6 (1949); *County Commissioners v. Hunter,* 207 Md. 171 (1955); *Sainato v. Potter,* 222 Md. 263 (1960).

**8.** *Whitman v. Forney, supra,* 181 Md. 652.

tial distance" apart. This apparently had some significance, for it followed directly the court's observation that "[i]f this surface run off had been direct from an adjacent, or even a nearby, land owner, one might argue that the flooding would have been a foreseeable injury to the complainant, as the lower land owner, but in this case there is no allegation that any of the respondents are adjacent land owners."

Our problem with this is three-fold. First, the second amended complaint, though not alleging that the various offending properties were "adjacent," did aver that they were "in close proximity to the Complainants' property," and, in the case of the Board of Education, that it was "just west and north" thereof. Second, the maps used by the court to support a contrary finding — that the defendants' properties were *not* "in close proximity" — were not part of the complaint. They constituted extrinsic evidence, which may well be trustworthy, but which should not have been used in ruling on the demurrers. Although at the beginning of its remarks, the court indicated that the allegations of the complaint could be "augmented by the doctrine of judicial notice," its comments regarding the locations of the various properties (save one) indicate that the maps were used more as independent evidence than as a source of judicial notice. In any event, we do not regard the juxtaposition of the several tracts involved here, or the distances between them, as being of such common knowledge to permit the taking of judicial notice.

Third, it is not necessary that the offending property abut, or be "adjacent" to, that of the complainants to afford a cause of action. *See, for example, Battisto v. Perkins, supra,* 210 Md. 542, where the defendant's property was some 1,400 feet (over a quarter mile) from the plaintiff's land.[9] That is not to say, of course, that the distance between the properties is

---

**9.** In *Battisto,* the Court reversed a directed verdict entered in favor of the defendants, who were the owners of the dominant ground. In their unsuccessful argument in defense of the verdict, they took pains to point out that their land was not contiguous to or adjoining the plaintiffs' properties, but was more than 1,400 feet away. *See* appellees' brief, *Battisto v. Perkins,* Oct. Term, 1955, No. 227, pp. 1, 2.

immaterial. It is an important element to be considered in determining reasonableness of use, and, indeed, it may in some cases be a most critical element; but it is not, of itself, dispositive.

The court also concluded that there was "no allegation to show that the defendants used their land in any unreasonable manner." That simply is not the case. Each defendant property owner was charged with filling, grading, and otherwise altering his land so as to "caus[e] the discharge of surface water in a different manner than the usual and ordinary natural course of drainage, and artificially and materially increasing the velocity and amount of storm water run-off." That increase, it was alleged, contributed to the flooding of complainants' property. As we have already observed, in Case II, alleging negligence, complainants specifically averred that appellees "failed to take adequate and reasonable precautions" to prevent foreseeable harm to the complainants by "fail[ing] to provide adequate storm water management to control the increased volume and velocity of surface water run-off caused by the development of [their] property."

Those averments constitute sufficient allegations of an unreasonable and actionable use of appellees' lands. As the Court made clear in *Biberman v. Funkhouser, supra,* 190 Md. 424, 429, "the upper owner has no right to discharge water into an artificial channel *or in a different manner than the usual and ordinary natural course of drainage, or put upon the lower land water which would not have flowed there if the natural drainage conditions had not been disturbed."* (Emphasis supplied.) *See also Parklawn, Inc. v. Giant Food, Inc.,* 262 Md. 148 (1971); *Laird, Rock & Small v. Harry T. Campbell & Sons, supra,* 200 Md. 627, and the other cases cited in footnotes 4-8, *supra.*

Finally, we come to the question of whether appellees may escape liability, as a matter of law, based upon a finding that tropical storm "David," and the flooding caused by it, amounted to an "Act of God." Once again, we have to pay careful attention to the averments of the second amended complaint.

Although it has never been definitively determined in Maryland, following the lead of the Court of Appeals in *Freter v. Embassy Moving & Storage Co., Inc.,* 218 Md. 12 (1958), we shall assume that it was appropriate for the court to take judicial notice that tropical storm "David" was, in fact, an "Act of God." [10] That does not end the inquiry, however; the mere fact that "David" was an "Act of God" does not, of itself, serve to exonerate appellees from liability.

An "Act of God" will excuse mortal man from responsibility only if God is the sole cause. As the Court noted in *Fergusson v. Brent,* 12 Md. 9, 31 (1858) — where a shipowner interposed that defense to escape liability for loss of cargo when its ship sank — the defense of "Act of God" "excludes all circumstances produced by human agency, so that if divers causes concur in the loss, the act of God being one, but not the proximate cause, it does not discharge the carrier. To relieve him, the act of God must be the immediate cause of the loss, and without which it would not have occurred." This same concept was applied a century later in *Freter v. Embassy Moving & Storage Co., Inc., supra,* 218 Md. 12, 15, where, in the context of a warehouseman's offering of the defense, the Court observed that, "[a]n act of God does not exonerate a warehouseman from liability for damage to goods in its care if it contributed to the damage, in whole or in part, by its negligence." *Cf. True v. Mayor and Commissioners of Westernport,* 196 Md. 280 (1950); Annot., *Liability for Overflow or Escape of Water from Reservoir, Ditch, or Artificial Pond,* 169 A.L.R. 517, 533, *et seq.* (1947); Annot., *Determination of Quantum of Damages for Injury to Property Recoverable Against Defendant Whose Wrong*

---

**10.** To take judicial notice that a particular occurrence is an "Act of God" presupposes some clear definition of that term. In that regard, *see Fergusson v. Brent,* 12 Md. 9, 31 (1858), and *Kirby v. Wylie,* 108 Md. 501, 512-13 (1908), where, after suggesting that the legal meaning of the term "is not perhaps susceptible of a definition which will include every case to which it may be applied," the Court adopted Lord Mansfield's definition as being "about as accurate and specific as, perhaps, any that could be given"; namely, "By the act of God, is meant a natural necessity, which could not have been occasioned by the intervention of man, but proceeding from physical causes alone, such as the violence of the winds, or seas, lightning, or other natural accidents."

*Concurred With Act of God,* 112 A.L.R. 1084 (1938); *Bowman v. Columbia Telephone Company,* 179 A.2d 197 (Pa. 1962); *Davis v. Country Club, Inc.,* 381 S.W.2d 308 (Tenn.App. 1963); Note, *"Act of God" as a Defense in Negligence Cases,* 25 Drake L. Rev. 754 (1976); Note, *Responsibility and Measure of Damages for Negligence Concurring With Act of God,* 33 Ill. L. Rev. 113 (1938); Comment, *Water Law — Act of God Defense — Flood Damage from Reservoir Overflow,* 50 Denver L.J. 381 (1973); Note, *Act of God,* 4 S.C.L.Q. 421 (1952).

The same principle applies in the case at hand. Where God and man collaborate in causing flood damage, man must pay at least for his share of the blame. *See Burton v. Douglas County,* 539 P.2d 97 (Wash.App. 1975); *Dougherty v. California-Pacific Utilities Company,* 546 P.2d 880 (Utah 1976); *Bodick v. Harcliff Mining Company,* 222 A.2d 615 (Pa.Super. 1966); *Baum v. County of Scotts Bluff,* 109 N.W.2d 295 (Neb. 1961); *Fred Drew Construction Co. v. Mire,* 89 A.2d 634 (D.C. 1952); *Stiers v. Mayhall,* 248 P.2d 1047 (Okla. 1952); *Carlson v. A & P Corrugated Box Corporation,* 72 A.2d 290 (Pa. 1950). The prevailing rule, in terms of apportioning the loss, seems to be as stated in the aforementioned annotation, 112 A.L.R. 1084, 1085:

> "In the majority of the cases involving the flooding of lands in which it appeared that part of the waters doing the damage complained of were the result of an act of God and part were the result of defendant's negligent or wrongful acts, it has been held that defendant was liable only for the proportionate amount of the damage caused by the waters attributable to his fault."

In crediting the "Act of God" defense, the trial court concluded that the complainants' damages were directly and proximately caused by the Act of God, rather than by the actions of the defendants, and that, to the extent their development activities added in any way to the flooding, their share of the blame was "de minimis." Those conclusions, however, necessarily rested upon a number of

factual assumptions that were not only extraneous to the second amended complaint but which were actually in derogation of its averments.

In summary, we think that the second amended complaint does suffice to state a cause of action — in trespass, negligence, and private nuisance. When all of the relevant facts are considered, it may well be that a trier of fact could properly reach the same ultimate conclusions reached here — that appellees' activities were either not unreasonable in the first instance or, if they were, that they were not the cause of any substantial injury suffered by complainants. We simply do not think that those conclusions can appropriately be drawn from the present state of the pleadings. As the Court observed in *Fiorita v. McCorkle,* 222 Md. 524, 526 (1960), "if parties intent to seek a decision without trial by amplifying the pleadings, they should in almost every instance, resort to motion for summary judgment and not to demurrer."

> *Judgment as to Baltimore County affirmed; judgments as to other appellees reversed; case remanded for further proceedings; costs to be allocated one-third to appellants, two-thirds to appellees.*